## DEN EX DEM. VAN KLEEK v. O'HANLON.

1. The decree of the Orphans' Court on a matter within their jurisdiction is conclusive, and cannot be impeached, though irregular and unlawful, when brought in question collaterally.

2. In New Jersey lands escheat to the State, in case of the death of the owner intestate and without heirs.   And the title vests in the State instanter on death of owner.

3. The Orphans' Court has not power to order lands which have escheated to the State, to be sold for payment of the debts of their former owner.

4. An inquisition of escheat, without judgment upon it, is competent evidence though not conclusive, against all persons to prove the finding contained in it.

On writ of Error to the Supreme Court.

This cause was an ejectment brought by the plaintiff in error, in the Bergen County Circuit Court, for lands in that county. The cause was tried upon the general issue, and verdict and judgment for the plaintiff.   At the trial a bill of exceptions was sealed, and on error to the Supreme Court the judgment of the Circuit Court was reversed.   The plaintiff in ejectment there-

upon sued out a writ of error, and removed the judgment and proceedings of the Supreme Court into this court.

The facts of the case are sufficiently stated in the report of the decision in the Supreme Court, (1 *Spenc. R.* 32,) and need not be here repeated.

The cause was argued January Term, 1846, by *A. O. Zabriskie*, and *P. D. Vroom*, for plaintiff in error, and *W. Halsted*, and *E. B. D. Ogden*, for defendant.

The CHANCELLOR having been concerned as counsel in the cause, and HORNBLOWER, C. J. and NEVIUS and WHITEHEAD, JJ. having expressed opinions in the court below, did not sit on the argument.

Three points were raised. 1. Whether the judge was correct in his charge to the jury, that the decree of the Orphans' Court, even if irregular and unlawful, was valid while unreversed, and could not be treated as a nullity. 2. Was the inquisition of escheat competent and legal evidence? 3. The right of the Orphans' Court to order the sale of escheated lands to pay debts of decedent.

*Zabriskie*, for plaintiff. 1. The Orphans' Court is a court of general jurisdiction as to the sale of lands, and the order, even if defective, is binding until reversed by direct proceeding. It cannot be treated as a nullity. *Den* v. *Hammel*, 3 *Har. R.* 73, opinion of Ford, J.; *Kempe's lessee* v. *Kennedy*, 5 *Cranch*, 173; *Ex parte Watkins*, 3 *Peters.* 193; *Hartshorne* v. *Johnson*, 2 *Halst. R.* 108.

2. The Circuit Court was right in rejecting inquisition. In England an inquisition is *prima facie* evidence. 1 *Phil. Ev.* 300; 1 *Starkie Ev.* 255. This is on the same principles that would exclude it here. At common law it was final, and not traversable; the only remedy was by *monsstrans de droit*; 3 *Bl. Com.* 397; and after traverse given by statute no judgment was *required*, it was final. In New Jersey it is by statute a mere incipient step, like an indictment; requiring 1. Advertising;

2. Notice to tenant; 3. Trial, if traversed; 4. Judgment; 5. Execution; *El. Dig.* 162. In England, on traverse, proof lies on traverser; 3 *Bl. Com.* 260; here on State; inquisition not even presumptive, *El. Dig.* 162, § 2. In England escheat was by virtue of the feudal tenure, a reversion to land on failure of heirs of grantee, and required *entry* or writ of escheat to complete the title. 2 *Bl. Com.* 72, 244, 445; 3 *Cruise,* 437, 461; 1 *Coke,* 18 n.

But where feudal law does not prevail, the state by law provides for property vacant by death of owner without heirs. Our act provides inquisition as one step in proceedings to vest lands, not in state, but in purchaser at the sale therein provided. *El. Dig.* 162. By the act of March 10, 1836, (*Pam. Laws* 385,) in evidence here, it appears that this inquisition was in fact traversed. So that both at law and in fact the inquisition offered was only *part of* a record, and the whole record must be offered; verdict without judgment is not evidence. 1 *Stark. Ev.* 245; 1 *Phil. Ev.* 311; *Westbrook* v. *Eager,* 1 *Har.* 81.

3. The Circuit Court rightly charged that Leake's lands, passed by virtue of order of sale and administrator's deed, even if he died without heirs, and they escheated to the state.

The difficulty arises under the 22d section of act of Feb. 18, 1799, *R. L.* 430; *El. Dig.* 486, declaring effect of administrator's deed. "Which deed shall vest in the said purchaser as good and perfect an estate in the premises therein mentioned, as the heirs or devisees of the said testator or intestate were seised of, or entitled to, at the time of the making of the said order by such Orphans' Court." This is declarative of effect of deed, and although it contains no negative words, might be construed to mean no greater estate, if such construction was not inconsistent with plain intent expressed in other parts of statute. And in construing any section, the intent to be gathered from whole act taken together is to prevail. The letter of the law must yield to that intention thus ascertained—and the statute, if remedial, must be construed liberally. 1 *Bl. Com.* 87; 1 *Kent C.* 461, 2, 3, and 465, *n. a.;* *U. S.* v. *Fisher,* 2 *Cranch,* 358; *Doe* v. *Branding,* 7 *B. &. C.* 643; *Brown* v. *Wright,* 1 *Green R.* 240; *Holbrook* v. *Holbrook,* 1 *Pick.* 254;

*Crane* v. *Alling,* 2 *Green,* 593; *People* v. *Utica Ins. Co.* 15 *John.* 380; *Thomson* v. *Egbert,* 2 *Harr.* 461; 2 *Plowd.* 465; *Den* v. *Urison,* 1 *Penn.* 217 and 222.

Try the act by these rules, keeping in view the old law, the mischief and the remedy, (*Heydon's Case,* 3 *Rep.* 7.) The old law was, that lands could not be sold for debts—the mischief, that creditors were cheated. The remedy, to compel sale in *all cases* by process of law; "escheated lands" are within the mischief, and therefore within the remedy. The history of legislation is given in *Den* v. *Hunt,* 6 *Halst.* 1. The act of 1743, *Alison* 129, made all lands assets, *Coxe* 132. Act of December, 1784, directed all lands of which decedent died seised, to be sold. And the whole of the act of 1799, except the 22d section, provides for the sale of the lands of which *any* decedent, not only those *leaving heirs,* died seised. The object of the 22d section was not to protect *escheated* lands, or to alter the rule as to *whose* lands would be liable to sale for debts, but to protect *bona fide* purchasers from heirs, who under act of 1784 were not safe from Orphans' Court sale at any distance of time, and thus protect a wise and cherished policy of facility and certainty in alienation of lands. The acts of 1825 and 1837, *El. Dig.* 493 and 494, and the opinion of Chancellor Williamson, quoted in *Den* v. *Hunt,* 6 *Halst.* 11, shew this.

Of the *general intent* of this legislation in New Jersey on this subject, there can be no doubt; and of the *particular intent* of the alteration, in act of 1799, there can be as little doubt.

This construction does no violence to the words of section 22; it only changes a construction otherwise natural from its words, by an overruling construction from the whole act.

A literal construction of this section would secure the fee from sale in case of entailment, and the whole in case of devise or descent from heir before decree, as only the title of which heir was then seised would pass.

Again, the 12th section of this very act, the parallel section, declaring effect of sheriff's deed to be, to convey estate of defendant *at or before* judgment, has always been considered as controlled by the intention, as shewn in 2d and 6th sections, to convey estate of defendant *at or after* judgment. See construc-

tion of similar act of New York, *Moers* v. *White*, 6 *John. Ch. R.* 360.

As to the prerogative doctrine that the King or State is not bound by an act unless named, all the authorities agree that the King or State is bound by the general words of a statute which affects property, or operates *in rem*, or by statutes affecting persons which are made for suppression of wrongs. 1 *Bl. Com.* 262 ; *Magdalen College Case*, 11 *Rep.* 72 ; *U. States* v. *Fisher,* 2 *Cranch*, 358.

*Halsted* and *Ogden*, for defendant, contended that the Orphans' Court had no jurisdiction, and cited many authorities to shew that in special statutory proceedings, jurisdiction must appear on the face of the proceedings, but which it is not necessary to recapitulate.

2. That statutes containing general words, do not bind the state, unless by necessary implication. *Lib. of Law & Equity*, 2 *vol. p.* 16 ; 5 *Mason*, 425 ; *Att. Gen.* v. *Donaldson*, 10 *M. & Welsb.* 117 ; *Ballentine on Lim.* 18 note 2 & cases.

3. Inquisition competent evidence. *Stokes* v. *Dawes*, 4 *Mason*, 268 ; *Den* v. *Clark*, 5 *Halst.* 217 ; *Shelford* 63, 65.

*Vroom*, in reply, was relieved by the court so far as related to the validity of the proceedings and decree of the Orphans' Court in point of form. The court being unanimous in the opinion that orders of the Orphans' Court, on matters within their jurisdiction were conclusive and binding, and could not be impeached collaterally for any irregularity or illegality apparent on the face of them. He argued from the history of the legislation in this state on the subject of making the lands of decedents liable for the payment of debts, and to which he referred at length, that the object of legislation here has been to make them liable at all events and in all cases.

It is the land of the *testator* or *intestate* that the law authorizes to be sold for the payment of his debts—and so even if escheated to the state. The terms that the sale by order of the court shall vest in the purchaser as good an estate, &c. as the *heirs* or *devisees* were entitled to, at the time of making the order, were

put in for the benefit of innocent purchasers, under the heir and devisee. The surplus is to go to the heir or devisee, &c. In the spirit of the act it is to go to those who stand in their place. The meaning and intent of the act—its spirit—is to be looked to. *Qui haeret in litera, haeret in cortice.* 5 *Bac. Abr.* 486 ; *Lit. Prerogative ; Chitty Prerog.* 379, 382, 388 & *Cases* ; 7 *B. & C.* 643.

CARPENTER, J. This cause has been argued by counsel with great earnestness and ability, and my mind has not been without doubt on the main question presented for the consideration of the court. The inability of Justice RANDOLPH, from indisposition, to attend in court at the last term, necessarily continued the cause until the present. With this opportunity for examination and reflection, I have come to the conclusion that the judgment of the Supreme Court ought to be affirmed.

I say nothing of the point made by the counsel of the defendant in error, as to the supposed errors and irregularities in the proceedings and decree of the Orphans' Court. The court, on the argument, relieved the counsel of the plaintiff on the reply from that point, and I think with perfect propriety. We could not on the ground stated treat the decree of the Orphans' Court as a nullity. The main point which we are called upon to decide is, whether in New Jersey, when lands have escheated to the state, the Orphans' Court have jurisdiction or authority to order them to be sold for the payment of the debts of the former owner. If relevant, I do not doubt the competency of the inquisition : but whether relevant or irrelevant depends upon the main point in the cause which I have just stated.

It may be assumed, indeed it cannot be questioned, that lands may escheat in New Jersey, in case of the death of a former owner intestate, and leaving no heirs capable of inheriting. It is a right on the part of the state which has been asserted by the legislature, and enactments are on the statute book to regulate and enforce it. In such case *eo instanti*, and before office found the title to the lands escheated vests in the state. The title being so vested in the state, can it be divested by the authority of the Orphans' Court decreeing a sale in order to pay the debts of the former owner ?

It is not a question whether those debts ought to be paid from the proceeds of the lands. It is not to be presumed that the state would hold lands escheated, without doing justice to the creditors of the deceased and former owner. But the sale of the lands of a decedent for the payment of his debts, depending entirely upon statutory authority, the sole question is whether the case under consideration comes within the existing provisions of the law on the subject. If liable to be sold, it must be under the authority of some statute. The authority is supposed by the counsel of the plaintiff in error to be found in the "act making lands liable to be sold for the payment of debts," (18 Feb. 1799, § 19-24 ;) and in relation to which subject there are also some subsequent enactments.

The difficulty which I find as to bringing the case within the provisions of these enactments is, that the state is not named. It is a general rule of ancient and well settled authority, that the sovereign power, (in England represented by the King,) is not restrained of a previous right by the general words of a statute. The rule in England is that the King is not bound by any statute which may tend to restrain any right, title or intent belonging to the crown, unless it extend to him by express words or by necessary implication. The most general words that can be devised affect him not the least; but the rule is subject to certain exceptions, as in the case of statutes against wrongs, and to prevent frauds ; statutes for the advancement of religion, learning, &c. 1 *B: C.* 261 ; 1 *Kent Com.* 460 ; *Com. Dig. Parliament R.* 8 ; 5 *C.* 14.

It is a rule which has been adopted and recognized in this country as applicable to our institutions. It is a rule not founded on royal prerogative, but on principles of public policy ;— that the state should not suffer from the negligence of its officers and servants. Thus under this principle, the King, or in this country the State, is not bound by the statutes of limitation. The maxim is *nullum tempus occurrit regi. Broom's Legal Maxims* 27, (*Law Lib.;*) *The People* v. *Gilbert,* 18 *John.* 227 ; *Stoughton* v. *Baker,* 4 *Mass.* 522 (528.)

It is said in a case cited, that the reason for applying the maxim in a representative government, where the people act

Den ex d. Van Kleek v. O'Hanlon.

only through the delegated power of their agents, is equally cogent as in a kingly government. The rule stands on the same ground of expediency and public conveniency. By the 13th section of the " act for the limitation of actions," (*Rev. L.* 412,) no person shall be sued or implicated by the State of New Jersey for any lands, &c., or for the rents and profits thereof, but within twenty years after the right, title or cause of action has accrued to the state. This enactment was only rendered necessary because the state was not bound by the general words in the preceding section of the same statute.

The general rule will scarcely be disputed; but it is said that this statute is one for the prevention of wrong, and that therefore the state is impliedly bound. The exception, as stated in some of the authorities, is exceedingly vague, opens the door to great latitude of construction, and would leave the rights of the state very unsettled in such matters. It is however stated in this manner, by the learned commentator on the laws of England, and so far as my researches enable me to judge, with correctness and precision. "Yet when an act of parliament is expressly made for the preservation of *public* rights and the suppression of *public* wrongs, and does not interfere with the established rights of the crown, it is said to be binding as well upon the king as upon the subject." 1 *B. C.* 262. I apprehend this is not such a case of public wrong as will bring the state within the general words of the statute. The statute is one passed for the protection of private, individual rights, and in all its phraseology applies but to private rights. In the next place it is not to be supposed that the state would act unjustly, and the supposition cannot be made in order to find a reason for binding her by the provisions of a statute in which she is not named. The title of land having vested in the state by escheat, it is certainly right and proper that the debts of the decedent, if other means do not exist, should be satisfied by resort to the land. The state would doubtless so appropriate it, either by general enactment or by some special provision to meet such a case. In point of fact, as I take it, this seems to be one of those cases to which the rule strictly defined, especially applies. It

is one of those cases where the property and peculiar privileges of the state are to be affected. "Where a statute is general, and thereby any prerogative, right, title or interest is divested or taken from the king, in such case the king shall not be bound, unless the statute is made by express words to extend to him." *Bac. Abr. tit. " Prerogative "* (*E.* 5.) The case of *Magdalen College*, 11 *Co.* 66 *b.* (74 *b.*) The fee of the escheated lands having vested in the state, it is sought to divest her title by means of this statute, in which she is neither named expressly, nor included by equivalent words.

The discussion has already somewhat anticipated the question whether the state in this case is bound or included by necessary implication. The statute, in general words, directs that when any executor or administrator shall discover or believe that the personal estate of his testator or intestate is insufficient to pay his debts, it shall be his duty as soon as may be, to apply, &c., and request the aid of the Orphans' Court in the premises, &c. (*Act* 1799, § 18, *Elm. Dig.* 489.) Does any intention appear on the face of the statute in the directions under which a sale of land is to be obtained, to include the case of escheated lands and to divest the title of the state? I admit that if such intention does appear by necessary, or as the rule is sometimes expressed, by reasonable implication, that in such case without express words, the Orphans' Court has authority to decree a sale. I have carefully examined the language of the statute, and it does appear to me that the phraseology throughout excludes the idea. To me it seems evident, that a sale of lands in the hands of the state under these proceedings, was not contemplated by the legislature in passing these laws. All *persons* interested are to have notice of the application to the Orphans' Court—a phrase which will not apply to the state. In *Regine* v. *Tuchin*, (2 *Lord Raym.* 1066, *s. c.* 1 *Salk.* 51,) it was held that the crown was not included in a statute by the name of *party*. No provision is made, in this statute or in any other, for the protection of the rights of the state in the lands supposed to be subject to the order of sale. There is no one charged by the law with the duty of looking after those interests, and of seeing that they are not wantonly and fraudulently disregarded and destroyed.

Persons interested, *heirs* and *devisees* only are to be notified of the proceedings, and their rights are protected, but how are the interests of the state guarded? If surplus, to whom paid? What officer of the state required to call the administrator to an account? I but allude to the statute in this point of view, which has been enlarged upon by the CHIEF JUSTICE, in his opinion delivered in the court below; and I will simply add that when the conveyance is made under the decree of the Orphans' Court, it is the estate which the *heir* or *devisee* had in the premises, at the time of making the order that is conveyed. So far then from the peculiar phraseology of these enactments, enlarging by implication the effect of the general words, and showing an intention to affect lands in the hands of the state, the effect, in my judgment, is the reverse. The scope and design of the statute is manifestly to make lands in the hands of the heir or devisee, subject to the payment of the debts of the decedent, leaving such lands as might escheat unaffected, and their case to be provided for, if provision should become necessary, by future general or special legislation. The object of this legislation has been to secure the rights of honest creditors consistently with the rights of heirs and devisees ; but it has also been to secure the rights of such creditors against heirs and devisees, and not against the state itself.

Great stress has been laid upon the supposed design of the legislature, in the successive enactments in regard to making lands liable to the payment of debts, and great consideration is undoubtedly due to the general scope of this legislation. The mischief, the old law, and the remedy, are doubtless to be considered in the construction of all remedial statutes. But the supposed general intention of the legislature is to be considered in due subservience to the actual language used ; and the language is not to be strained to support such supposed intention. A late English decision, on a somewhat analogous statute, deserves to be noticed in this connection. The statute 3 *W. & M.* c. 14, (in part re-enacted in this state,) in its preamble recites, that it is not just that by the practice of any debtors, their creditors should be defrauded of their just debts, but that nevertheless it has often happened that persons having by bonds or other

specialties bound themselves or their heirs, have died seised in fee of lands, and have by their wills, in fraud of their creditors, devised their lands in such manner as that their creditors have lost their debts. The second section for remedying this evil then enacts that all wills of lands whereof any person shall die seised in fee simple, shall be deemed (only as against such creditors) to be fraudulent and void. The third then proceeds to enact, that in case of such devises the creditor shall and may maintain his action of debt against the *heir and devisee jointly.* No provision is made for the case of a devisor dying without an heir; but in the case cited it was earnestly argued that such a case was manifestly within the mischief intended to be remedied, and that the court would construe the third section so as to give an effectual remedy; and that an action of debt on the statute, should be sustained against the devisee 'alone. It was urged that the meaning simply was, that when there is an heir he must be joined; but that when no heir, the devisee may be sued alone. That otherwise the operation of the second section would be much narrowed; and that the statute was passed to prevent creditors from being defrauded of their debts, and ought therefore to be liberally construed. But notwithstanding the force of this reasoning, and the obvious general intention of the legislature, the court held that it could not extend the remedy beyond that provided, and the general scope of the statute was restrained by a deficiency in the detail. *Hunting* v. *Sheldrake,* 9 *Mees. & Welsb.* 256. So in the present instance, however desirable it may be to secure the rights of creditors in the case of escheated lands by general legislation, and not oblige the creditors to rely on the mere sense of justice in the legislature of the state, yet the language of the statute, to which we are referred, is inapplicable. The statute does not by its general words bind the state, and its particular phraseology excludes implication. It is a *casus omissus,* which cannot be supplied by the construction of the court; to do so would be to make laws, not to construe them.

I have not referred to the acts of 1825 and of 1837, by which a sort of qualified lien is created on the lands of a deceased debtor, making them liable to be sold by proceedings in the Or-

Den ex d. Van Kleck v. O'Hanlon.

phans' Court, notwithstanding alienation by the heir or devisee, if the order be obtained within one year from the death of the decedent. These statutes do not alter or affect the case in the point of view in which I have considered it. Under the best consideration which I have been enabled to give to this case, I am of the opinion that the judgment of the Supreme Court should be *affirmed*.

RANDOLPH, J. John G. Leake, under whom the lessor of the plaintiff (Van Kleek) claims, died seised of the premises in controversy on the 2d of June, 1827, without devising the same and without heirs capable of inheriting, he being at his decease an alien. Upon the application of Leake's administrators, the Orphans' Court of the county of Bergen, in the Term of January, 1835, decreed the premises to be sold for the payment of the debts of the deceased. Van Kleek, claiming title, under this sale, obtained a judgment in ejectment in the Circuit Court for Bergen county, which was reversed by the Supreme Court. In reviewing these decisions in this court, the material question is, whether the decree of the Orphans' Court be legal and valid?

By long and well established principles, upon the death of an individual without heirs capable of inheriting his real estate, and without devising the same in due form, it *escheats* or *falls* to the chief lord of the fee, or as we have it, to the state; and as lands cannot be in abeyance or without an owner for a single moment, the transition to the lord of the fee or the state takes place the instant the owner dies, and without inquest of office. 1 *J. C. R.* 366. So that upon the death of Leake the lands in question vested in the state as an escheat, and the plaintiff can have no title to them unless the decree of the Orphans' Court can divest the title of the state, and create one of paramount character in the purchaser and those claiming under him. The Orphans' Court have no power to order the sale of real estate, except as conferred by statute. The act of 1784, constituting the Orphans' Court, authorized it to decree a sale of the real estate to pay the debts of the deceased owner thereof, in case of a deficiency of personal estate to answer that purpose, and

the deed of the executor or administrator under such a sale, was declared to vest in the purchaser *as good and perfect an estate as the owner was seised of at the time of his decease.* This provision was altered and repealed by the act of Feb. 18, 1799, by the 22d section of which the deed of the executor or administrator on a sale to pay debts, under an order of the Orphans' Court, is made to vest in the purchaser as good and perfect an estate as the *heir or devisee was seised* of, or entitled to, at the time of the *decree for sale.* Neither act, strictly speaking, constituted a lien for the creditor on the estate of his deceased debtor, but both authorised a sale for the payment of debts under certain circumstances; under the act of 1784, the heir or devisee could not encumber the property to the prejudice of the creditors, but he could under the act of 1799, so as to give priority to his own creditors over those of his ancestor or devisor, provided their mortgage or judgment had priority to the decree of the Orphans' Court for sale to pay debts—or the heir or devisee might sell the land and make a good title therefor, though the decedent's creditors might not receive a dollar on their claims. It was so determined by Chancellor Williamson, in *Parret* v. *Van Wickle,* where the mortgage of an heir was decreed to have priority to a deed made under a sale by order of the Orphan's Court to pay the debts of the ancestor. And so too in the case of *Warrick* v. *Smith,* 6 *Halst.* 1, where the Supreme Court decided that the purchaser, under an execution against the devisee, took the land in preference to a purchaser under a decree of the Orphans' Court to sell for the payment of the debts of the devisor.

These cases turned on the point that by the act of 1799, the title conveyed under a decree of the Orphans' Court to sell in order to pay the debts of the deceased owner, only transferred the title, which the heir or devisee had in the estate at the time of the decree for sale, and not the title which the ancestor or devisor had at the time of his decease. To remedy these evils, and at the same time not to revive the long-continuing liability of the estate as under the act of 1784, the legislature passed a supplement, December 12, 1825, by which the act of 1799 was so modified as to render the real estate of the person dying

seised thereof or entitled to the same, liable for his debts for one year after his decease, notwithstanding any alteration or encumbrance by the heir or devisee. This supplement, however, has no effect upon the present question, for here there was no decree of the Orphans' Court for sale of the premises within one year after Leake's death, and if there had been, there was no devisee or heir whose title could be transferred to the purchaser free from his own deed or encumbrance.

We then come back to the act of 1799, and inquire whose estate must be sold, and whose title conveyed ? Upon the death of the ancestor or devisor, his estate vested in the heir or devisee, subject to be afterwards defeated, under the act of 1784, by a decree of the Orphans' Court at any time afterwards, ordering a sale to pay the debts of the original owner, which sale created as good and perfect an estate as the original owner had at his decease; and under the act of 1799 it might be defeated, provided the decree for sale was made prior to a sale or incumbrance by the heir or devisee, for the estate is vested in him free and clear of any lien, and until there is a decree of the Orphans' Court he may sell or encumber it, and whenever it is sold pursuant to the decree, it is only such estate as the heir or devisee had at the time of the decree. In the present case there was no estate or title for the decree of the Orphans' Court to operate on; there was no heir or devisee in the case, whose estate, as good and imperfect or as worthless as it might be, would be conveyed to the purchaser. The estate which Leake had at his death, or one as good and perfect as this, could not be conveyed, for the act of 1784 was repealed, and the estate which he had was vested, not in his heir or devisee, but in the state, over whom or whose interest in the premises the Orphans' Court had no power, and it is in vain to attempt by construction, to bring the case within the statute, it is not within the letter, nor can the spirit and meaning cover the case, when it is so manifestly an omission, and not thought of by the legislature. The justice, hardship or propriety of a case, can furnish no warrant for judicial legislation. Nor does the case of *Moers* v. *White*, 6 *J. C. R.* 360, in my judgment authorize the conclusion sought to be deduced from it. This is a New York case, and the stat-

ute in that state respecting escheats, has a section not embraced by our statute—this section directs that the surplus personal estate of an alien dying without leaving a will, or person entitled to the same shall be paid into the treasury, from whence it is drawn by an order of the Court of Chancery directing payment to the persons entitled thereto.

In the case of *Moers* v. *White*, it appears that Rouse's Point belonged to the deceased, and had been seized by the U. S. Government for public purposes, its value assessed under the statute, and the amount thereof paid into the state treasury, subject to the order of the Court of Chancery. A distribution was accordingly ordered, as of personal property under the first section of the act respecting escheats—and the title to the land or construction of the power of the Judge of Probate to order sale thereof to pay debts, was not necessarily considered, but the Chancellor held that although the land, or rather the interest of the devisee therein, escheated by reason of the alienage of the devisee, in whom it had vested, still it remained subject to the *lien* of the debts of the devisors, for by the 24th section of the act relating to the Court of Probate, 1 *N. Y. R. L.* 450, a conveyance under an order of that court to sell to pay debts, is valid and effectual against the heirs and devisees, and all claiming by, from, or under them; of course in New York the Judge of Probate may order lands sold to pay debts of the ancestor or devisor, though they may have escheated to the state upon the death of the heir or devisee without leaving a will or person capable of inheriting, for the state claims by, from, or under the heir or devisee, and paramount to that is the right of the Judge of Probate to order a sale to pay the debts of the ancestor or devisor.

Under our act of 1784, a similar case would probably have received a similar construction, for the deed under that act conveyed not merely such an estate as the heir or devisee had, but such as the ancestor or testator died seised of, or owned, at the time of his death. I therefore concur in opinion with the Supreme Court on this point, and also on the question of evidence respecting the inquest, the same being in my judgment evidence on the part of the defendant in an action of ejectment, where the issue of title is with the plaintiff.

In *Den* v. *Hammell* 3 *Harr.* the Supreme Court directed that the validity of a decree of the Orphans' Court ordering a sale of real estate to pay debts, could not be called in question in a collateral way, though apparently so erroneous that it would have been set aside on *Certiorari*, and I see no good reason for disturbing this decision, but many difficulties that might arise if the rule were changed.

Let the judgment of the Supreme Court be affirmed.

*For Affirmance*—Judges CARPENTER, RANDOLPH, PORTER, SPEER and SPENCER—5.

*For Reversal*—Judges SCHENCK and ROBERTSON—2.

Judgment affirmed.

CITED *in Hess* v. *Cole*, 3 *Zab.* 122; *Colgan* v. *McKeon*, 4 *Zab.* 575; *Stokes* v. *Middleton*, 4 *Dutch.* 36; *Russel* v. *Work*, 6 *Vr.* 319; *Young* v. *Rathbone*, 1 *C. E. Gr.* 227.